Adam Kraut
Attorney Id. No. 318482
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
*App. for Pro Hac Vice Forthcoming*

Joshua Prince, Esq.
Attorney ID: 306521
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
P: 888-202-9297 ext. 81114
F: 610-400-8439
E: Joshua@Civilrightsdefensefirm.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EMILY COWEY;** | : | Civil Rights Complaint |
| **CHELSEA SCHMIDT;** | : | 42 U.S.C. § 1983 |
| **ALAN BOOTH; and,** | : | |
| **FIREARMS POLICY** | : | |
| **COALITION, INC.,** | : | Case No. - 2:20-cv-1845 |
| Plaintiffs | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SHERIFF WILLIAM MULLEN;** | : | |
| **COUNTY OF ALLEGHENY,** | : | |
| **PENNSYLVANIA; and,** | : | |
| **PSP COMMISSIONER COL.** | : | |
| **ROBERT EVANCHICK,** | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

COME NOW Plaintiffs Emily Cowey, Chelsea Schmidt, Alan Booth, and Firearms Policy Coalition, Inc., on behalf of themselves and those similarly situated, by and through their attorneys, Adam Kraut of Firearms Policy Coalition, Inc., Joshua Prince of Civil Rights Defense Firm, P.C., and Raymond M. DiGuiseppe of The DiGuiseppe Law Firm, P.C. and complain of Defendants Sheriff William Mullen, County of Allegheny, Pennsylvania, and Commissioner of the Pennsylvania State Police Colonel Robert Evanchick as follows:

## INTRODUCTION

1.  The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. When the People, by enacting that amendment, enshrined in their Nation's fundamental charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean to leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*.

2.      State and local governments, whether legislatively or by executive decree, cannot simply suspend the Constitution. Authorities may not, by decree or otherwise, enact and/or enforce a suspension or deprivation of constitutional liberties. And they certainly may not use a public health crisis as political cover to impose bans and restrictions on rights they do not like.

3.      Yet, just like New York Governor Andrew Cuomo in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U. S. ____ (2020),[1] Defendants Allegheny County Sheriff William Mullen ("Sheriff Mullen") and County of Allegheny, Pennsylvania, Pennsylvania ("County") (collectively "County Defendants") have done exactly that—treating firearm carry license applicants as second-class citizens, completely closing their Firearms Division while imposing "especially harsh" treatment of the right to bear arms—a total ban—through enforcement of the Commonwealth's criminal laws prohibiting the carry of firearms without a license.

4.      There are "many other less restrictive rules that could be adopted to minimize the risk to those" applying for such licenses. (*Id.*, slip op. at 4.)

5.      Just as "[g]overnment is not free to disregard the First Amendment in times of crisis," *id.* (Gorsuch, J., concurring), the Defendants here cannot ignore the

---

[1] Online at https://www.supremecourt.gov/opinions/20pdf/20a87_4g15.pdf.

Plaintiffs' fundamental, individual Second Amendment right to bear arms in public for lawful purposes including self-defense.

6. Plaintiffs Cowey, Schmidt, Booth, and all typical, law-abiding citizens, have a fundamental, constitutionally guaranteed right to carry loaded, operable handguns on their person, outside their homes, while in public and in motor vehicles, for lawful purposes including immediate self-defense.

7. In *District of Columbia v. Heller*, the U.S. Supreme Court held that to "bear arms" includes the "carry [of a firearm] ... in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584.

8. The Commonwealth of Pennsylvania generally bars the carrying of loaded firearms by ordinary citizens in public for self-defense, including in Defendant County of Allegheny, unless they first acquire a license to carry a firearm under 18 Pa.C.S. § 6109 ("LTCF").

9. Yesterday, the County Defendants enacted and began enforcing a policy completely closing their Firearms Division, making it impossible for Plaintiffs Cowey, Schmidt, Booth, Firearms Policy Coalition's members and supporters, and all similarly situated individuals who are legally eligible to possess and acquire firearms, to acquire a LTCF, thus completely shuttering access to the right to bear arms.

4

10.   Adding further insult to constitutional injury, should an unlicensed person be convicted for exercising her rights by carrying a handgun in public, she would lose her Second Amendment rights under federal law.

11.   Indeed, Defendants' laws, regulations, policies, and enforcement practices individually and collectively prevent law-abiding adults like Plaintiffs from exercising their fundamental, individual right to bear loaded, operable handguns outside the home through oppressive criminal statutes combined with a licensing system that is both required and closed to law-abiding people—and even when available, imposes severe delays and burdens upon them.

12.   Defendants' laws, regulations, policies, and enforcement practices thus violate the right to keep and bear arms expressly protected under the Second and Fourteenth Amendments to the United States Constitution.

13.   Uncertain times such as the present are precisely when Plaintiffs and Plaintiffs' members must be able to exercise their fundamental rights to keep and bear arms. The challenges we all face because of the COVID-19 Coronavirus, the election, social unrest, or other social ills do not, cannot, and must not justify or excuse government infringements upon fundamental human rights.

14.   As our high court just reminded us, "even in a pandemic, the Constitution

cannot be put away and forgotten." (*Diocese of Brooklyn*, 592 U. S. ____, slip op. at 5). "The restrictions at issue here, by effectively barring many from" exercising their right to bear arms, "strike at the very heart of the" Second Amendment's guarantee of liberty. *Id.*

15.     The declaratory and injunctive relief that Plaintiffs have been forced to seek through this action is necessary to uphold this bedrock principle of the United States Constitution.

## **PARTIES**

16.     Plaintiff Emily Cowey is a natural person, 31 years of age, a citizen of Allegheny County, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

17.     Plaintiff Chelsea Schmidt is a natural person, 30 years of age, a citizen of Allegheny County, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

18.     Plaintiff Alan Booth is a natural person, 24 years of age, a citizen of Allegheny County, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

19.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) non-profit organization incorporated under the laws of Delaware, with a place of business in Sacramento, California. The purposes of FPC include defending

and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in Pennsylvania, including in Allegheny County. FPC represents its members and supporters—who include gun owners, prospective gun owners, licensed firearm retailers, and others—and brings this action on behalf of itself, its members, including the named Plaintiffs herein, and supporters who possess all the indicia of membership. FPC's members have been adversely and directly harmed by Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein. FPC has expended and diverted resources because of the Defendant's enforcement and resultant policies, practices, and customs challenged herein.

20. Defendant Allegheny County Sheriff William P. Mullen ("Sheriff Mullen") is the elected sheriff of Allegheny County, Pennsylvania, and the head of the Allegheny County Sheriff's Office ("ACSO"). As Sheriff of the ACSO, which includes the County's Firearms Division, Sheriff Mullen formulates, enacts, and is currently enforcing the County's policies and practices as to applications for and issuance of LTCF, as well as the Commonwealth's

criminal laws. Defendant Sheriff Mullen has and continues to enforce laws and policies denying law-abiding adult citizens in Allegheny County their fundamental, individual right to bear arms. Defendant Sheriff Mullen is sued in his official capacity.

21. Defendant County of Allegheny, Pennsylvania is a county of the second class, established as a corporation under the laws of the Commonwealth of Pennsylvania, and can be sued under its name. 16 P.S. Counties §§ 3201-3102. Defendant County is sued under 42 U.S.C. § 1983 because it has enacted and is enforcing laws and policies that deprive, under color of law, Plaintiffs' and similarly situated persons' federal constitutional rights, privileges, and immunities secured by the Constitution.

22. The Allegheny County Sheriff's Office is an agency of the County that is not amenable to suit in its own name.

23. Defendant Colonel Robert Evanchick ("Evanchick") is the head and Commissioner of the Pennsylvania State Police ("PSP"). As Commissioner of the PSP, Defendant Evanchick, in addition to being responsible for assisting the Pennsylvania Governor in enforcing the laws of the Commonwealth of Pennsylvania, is responsible for the implementation, execution, and administration of the laws, regulations, customs, practices, and policies of the PSP and the Commonwealth, *inter alia*, in relation to the

Uniform Firearms Act, 18 Pa.C.S. § 6101, *et seq.* and the Pennsylvania Instant Check System. As Commissioner of the PSP, Defendant Evanchick is presently enforcing the Commonwealth's laws, regulations, customs, practices, and policies complained of in this action, including the Commonwealth's laws on the keeping and bearing of firearms especially, but not limited to, on public roads and in other public places. Defendant Evanchick is sued in his official capacity.

## JURISDICTION AND VENUE

24. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

25. This action for violation of Plaintiffs' constitutional rights is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees pursuant to 42 U.S.C. § 1988.

26. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Pennsylvania.

## STATEMENT OF FACTS

### *The Laws, Policies, And Enforcement Actions Affecting Plaintiffs*

27.   The foregoing paragraphs are incorporated herein as if set forth in full.

28.   The Commonwealth of Pennsylvania has broadly criminalized the carrying of

loaded firearms by ordinary citizens under 18 Pa.C.S. §§ 6106 and 6107,

making it a serious crime for law-abiding citizens to exercise their

fundamental right to bear arms in public for self-defense unless they first

acquire a license to carry a firearm under 18 Pa.C.S. § 6109.

29.   Arrest and prosecution for unlawfully carrying a firearm under the

Commonwealth's laws could result in a person's losing his or her Second

Amendment rights for the rest of his or her life.[2]

30.   18 Pa.C.S. § 6107 prohibits the "carry[ing of] a firearm upon the public streets

or upon any public property during an emergency proclaimed by a State or

---

[2] *See* 18 Pa.C.S. §§ 6106(a)(1) (making it a felony of the third degree for an individual to carry a firearm concealed on or about his person, except in his place of abode or fixed place of business without a LTCF) and 6106(a)(2) (grading the same offense as a misdemeanor of the first degree if the individual is eligible to receive a LTCF and has not committed any other criminal violations). *See also* 18 Pa.C.S. § 106(b)(6) (classifying a misdemeanor of the first degree as punishable by a term of imprisonment "of which is not more than five years"), 18 U.S.C. § 921(a)(20) (defining "crime punishable by imprisonment for a term exceeding one year" to include a state law misdemeanor punishable by *more than* two years imprisonment), and 18 U.S.C. § 922(g)(1) (making it unlawful for anyone convicted of a crime punishable for a term exceeding one year to possess firearms or ammunition).

municipal governmental executive" unless they possess a license to carry a firearm under 18 Pa.C.S. § 6109.

31.     Pennsylvania has been under a constant state of emergency, proclaimed by Governor Tom Wolf, since January 10, 2018.[3]

32.     Pennsylvania has been under an additional state of emergency, proclaimed by Governor Wolf, related to COVID-19 since March 6, 2020.[4]

33.     Because of those proclamations by Governor Wolf, 18 Pa.C.S. § 6107 additionally and currently restricts the Plaintiffs, and all those similarly situated, from transporting or carrying firearms in public, and upon public streets and public property, even for lawful purposes, including self-defense.

34.     A violation of 18 Pa.C.S. § 6107, pursuant to 18 Pa.C.S. § 6119, is a misdemeanor of the first degree, for which a conviction would prohibit the Plaintiffs, and those similarly situated, from being able to purchase, possess, and utilize firearms and ammunition, pursuant to 18 U.S.C. § 922(g)(1).

---

[3] *See* https://www.governor.pa.gov/newsroom/governor-wolf-declares-heroin-and-opioid-epidemic-a-statewide-disaster-emergency and
https://www.governor.pa.gov/newsroom/gov-wolf-signs-8th-opioid-disaster-declaration-renewal-vows-continued-concerted-efforts.
[4] *See* https://www.governor.pa.gov/newsroom/gov-wolf-signs-covid-19-disaster-declaration-to-provide-increased-support-for-state-response.

35.  Defendant Evanchick enforces the Commonwealth's laws pertaining to the keeping and bearing of firearms especially on, but not limited to, public roads and in other public places.

36.  Under the Uniform Firearms Act ("UFA"), the term "firearm" is generally defined to mean "[a]ny pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt or cylinder, whichever is applicable." 18 Pa.C.S. § 6102.

37.  18 Pa.C.S. § 6107 further provides that the term "firearm" "includes any weapon that is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any weapon," a substantially broader definition than that found in 18 Pa.C.S. § 6102.

38.  Pursuant to 18 Pa.C.S. § 6108, "[n]o person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless: (1) such person is licensed to carry a firearm; or

(2) such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license)."[5]

39.  On information and belief, Defendants' and their officers can and do enforce the Commonwealth's laws and regulations including 18 Pa.C.S. §§ 6106 and 6107.

40.  Under 18 Pa.C.S. § 6109(b), residents of a county of Pennsylvania must apply to the sheriff of their county.

41.  County Defendants "Firearms Division" accepts and processes applications for LTCFs.

42.  18 Pa.C.S. § 6109 and Defendants' policies and enforcement practices prevent Plaintiffs and others from applying for and being issued a LTCF by a sheriff of any other county in the Commonwealth, leaving Plaintiffs and others like them with no alternative means of acquiring a LTCF to lawfully exercise their right to bear arms in public other than applying for one in their own county.

---

[5] Philadelphia is currently the only city in the Commonwealth with a population large enough to constitute a "city of the first class." 53 P.S. § 101 (defining city of the first class to be those which contain a population of one million or more). See also U.S. Census Bureau QuickFacts for Philadelphia, Pennsylvania, (showing Philadelphia to have an estimated population of ~1,584,000, and Pittsburgh, the second largest estimated population of a city in the Commonwealth, having a population of ~300,000), online at https://www.census.gov/quickfacts/geo/chart/philadelphiacitypennsylvania/PST045219.

43.     A public notice posted on or about November 27, 2020, on County

Defendants' Facebook page[6] (Figure 1, below), states: "The Firearms

Division will be closed until further notice. We will be sanitizing the office

and waiting room as a precautionary measure due to COVID exposure. All

appointments will be redeemable at a future date & time."

**Figure 1**



44.     In response to County Defendants' notice on Facebook, Facebook user Darren

Miller commented (Figure 2, below) that the County Defendants' "Canceled

my appointment I waited 8 months for. Took [their LTCF appointment]

calendar offline. Won't even answer the phones. What exactly is the Firearms

Div doing during all this? Seriously... what is the daily activity in this office

whose sole purpose is to serve the public since they're completely ignoring

the public?"

---

[6] https://www.facebook.com/alleghenybadge/posts/10158354772670971. *See also*
https://twitter.com/alleghenybadge/status/1329448179843149824?s=20.

**Figure 2**



> **Darren Miller**
> Canceled my appointment I waited 8 months for. Took calendar offline.
> Won't even answer the phones.
>
> What exactly is the Firearms Div doing during all this? Seriously... what
> is the daily activity in this office whose sole purpose is to serve the
> public since they're completely ignoring the public?

45.   County Defendants currently are enforcing their policy that completely closes

their ACSO's operations with respect to timely accepting, processing, and

issuing LTCFs. Thus, the County Defendants have enacted and are currently

enforcing a policy declaring closed and eliminating constitutionally necessary

firearm-related services as "non-essential" and less important than other

programs and services they offer the public.

46.   In addition to County Defendants' currently enforced ACSO Firearms

Division closure policies, the County Defendants have and are enforcing

policies that, even when their Firearms Division is not fully closed, require

those seeking access to their ACSO's Firearms Division's constitutionally

necessary services—including Plaintiffs and their members and supporters,

and similarly situated members of the public—to spend hours or days trying

to schedule an appointment with the ACSO five months or longer into the

future to merely begin the process of applying for a LTCF. These policies

allow limited to no access to staff and services, impose severe delays, and

force applicants to complete a lengthy, burdensome process that "decide on a case-by-case basis" whether the applicants' right to bear arms "*is really worth insisting upon.*" *Heller*, 554 U.S. at 634.

47.   County Defendants' website for their Firearms Division, online at https://www.sheriffalleghenycounty.com/firearms.html, states in pertinent part:

> IMPORTANT UPDATE: Due to the recent spike in COVID-19 cases in Allegheny County and surrounding areas, we are temporarily not accepting walk-in applicants or renewals for Licenses to Carry Firearms. * * * We are not accepting future appointments at this time, as we are fully booked until April 1, 2021. If the need arises, we will open booking for April and beyond, but will only do so if we are unable to resume servicing walk-ins due to a persistance [*sic*] in the escalation of COVID-19 cases.

48.   The County Defendants' have and use various modern technologies to communicate with the public about official business, including telephones and phone calls, text messages, e-mail, and Internet-based Web forms. *See*, *e.g.*, https://www.sheriffalleghenycounty.com/tips.html.

49.   Even though the County Defendants provide and allow the public to use Web-based forms, e-mail, and other services for official business, they do not provide or allow individuals needing and using the constitutionally necessary services of their ACSO Firearms Division to do the same.

50.     The Schuylkill County, Pennsylvania Sheriff's Office, for example, has an online LTCF application system (Permitium PermitDirector) where applicants can complete all of the application requirements and pay the necessary fees online.[7]

51.     And the Schuylkill County Sheriff's Department is not alone in utilizing an efficient, accessible, and easy to use online LTCF application form, email, or other alternative means of accepting applications rather than in-person visits by applicants.

52.     The county sheriffs for the counties of Berks, Blair, Bucks, Cambria, Monroe, Montgomery, Pike, and Wayne all currently offer online applications.[8]

---

[7] *See* http://www.co.schuylkill.pa.us/offices/sheriff/index.asp. See also the online Web based LTCF form at https://schuylkillpaso.permitium.com/ccw/start?.

[8] *See*, https://www.co.berks.pa.us/Dept/Sheriff/Pages/FirearmsSection.aspx (declaring that "Firearm licensing through the Berks County Sheriff's Office can now be completed online by using the link below," online at https://berkspaso.permitium.com/ccw/start");

http://www.blairco.org/Dept/Sheriff/Pages/default.aspx (declaring that "YOU CAN NOW APPLY FOR YOUR CONCEALED CARRY LICENSE ONLINE! (CLICK HERE TO APPLY FOR YOUR LICENSE ONLINE!)");

http://www.buckscounty.org/government/RowOfficers/Sheriff/CarryLicense (declaring "Effective October 14, 2020 we will be starting a new on-line procedure to provide the most efficient way of processing gun permit applications. To apply for a License to Carry Firearms in Bucks County, Pa., please visit: https://buckspa.permitium.com/ccw/start");

https://www.cambriacountypa.gov/sheriff-office.aspx (declaring "*LICENSE TO CARRY PERMIT INFO* You can now apply for your License to Carry Permit Online! Click HERE to Apply Online Today!!");

http://www.monroecountypa.gov/Dept/Sheriff/Pages/ConWeapons.aspx (declaring "Due to the COVID-19 pandemic we will be accepting applications for concealed

Additionally, the Adams, Columbia, Fayette, Luzerne, McKean, Mercer, and York County sheriff departments are all in the process of implementing electronic submission options for LTCF applications.

53.     Permitium PermitDirector is a Web-based system "for weapon permits [that] serves as an end-to-end online solution that includes the application, background check tracking, processing, payment and issuance of gun and concealed carry permits." *See* https://permitium.com/products.html.

54.     The Permitium PermitDirector product has "913,070 CCW permits issued" and serves 200 counties in 13 states, including but not limited to Schuylkill County, Pennsylvania. *See* https://permitium.com/stats.html.

55.     County Defendants could, but do not, use an online, Web-based application system, such as Permitium, email, Web forms, or even electronically fill-able and sign-able PDF files to accept and process LTCF applications.

---

carry permits via email or regular mail until further notice.");
https://www.montcopa.org/401/Gun-Permits (declaring "Effective September 9, 2020 we have started a new on-line procedure to provide the most efficient way of processing gun permit applications. Emailed applications are no longer accepted. To apply for a License to Carry Firearms in Montgomery County, Pa., please visit: https://montgomerypa.permitium.com/ccw/start");
http://www.pikepa.org/Sheriffs/LTCApp.pdf (declaring that the Pike County Sheriff's Office accepts LTCF applications via email); and,
https://www.waynecountypa.gov/509/License-to-Carry-Information-Application (declaring that Wayne County Sheriff Mark Steelman "has moved part of the License to Carry a Firearm application process online. New applicants and renewing permit holders may now start the application process online.").

56.     The Commonwealth of Pennsylvania, by and through Defendant Evanchick and his Pennsylvania State Police, provide issuing authorities, such as County Defendants' ACSO, access to the Pennsylvania Instant Check System (PICS).

57.     Defendant Evanchick's online E-PICS system "is intended for use by Pennsylvania Licensed Firearm Dealers and County Sheriffs to verify an applicant's eligibility to legally purchase/transfer a firearm or obtain a License to Carry." *See* https://epics.pa.gov/Pics/.

58.     Defendants can use the Commonwealth's E-PICS "Instant Check System" to quickly verify that Plaintiffs are not disqualified from exercising Second Amendment rights and issue a LTCF immediately thereafter.

59.     County Defendants' ACSO is not scheduling LTCF application appointments for any time sooner than April 2021, and now, by their own admission, even longer into the future.

60.     On information and belief, the County Defendants and their ACSO cause such delays and burdens on a regular basis.

61.     Indeed, because the County Defendants treat the right to keep and bear arms as a second-class right, singled out for special—and specially unfavorable— treatment, Plaintiffs and members of the public who are required to communicate with and use the ACSO Firearms Division in order to access their fundamental, individual right to bear arms in public are provided with

limited or no access and inadequate services, thus delaying and/or denying access to and further burdening their rights.

62.    Moreover, on information and belief, County Defendants' policies and practices cause: 1) their ACSO Firearms Division to have less staff, resources, and capabilities than necessary to timely provide constitutionally required services that are necessary to access and exercise a fundamental, individual right; 2) their ACSO Firearms Division to add burden beyond what is required to determine if the applicant is "disqualified from exercising Second Amendment rights"; and 3) their ACSO to treat the ACSO's firearm-related services dis-favorably compared to the County Defendants' other services. These policies and practices thus "single[] out for special—and specially unfavorable—treatment" the right to keep and bear arms, rendering it a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 750, 778-780 (2010).

### Facts Specific to Plaintiff Cowey

63.    The foregoing paragraphs are incorporated herein as if set forth in full.

64.    Plaintiff Cowey is not disqualified from exercising Second Amendment Rights.

65.    Plaintiff Cowey:

a.    Is a United States citizen;

b.    Is a resident of Allegheny County, Pennsylvania, and citizen of the Commonwealth;

c.    Is over the age of 21;

d.    Is not under indictment;

e.    Has never been convicted of a felony or misdemeanor crime of domestic violence;

f.    Has never been convicted of a crime punishable by more than one (1) year;

g.    Is not a fugitive from justice;

h.    Is not an unlawful user of, or addicted to, any controlled substance;

i.    Has not been adjudicated a mental defective or been committed to a mental institution;

j.    Has not been discharged from the Armed Forces under dishonorable conditions;

k.    Has never renounced her citizenship; and,

l.    Is not the subject of a restraining order relating to an intimate partner.

66.    Plaintiff Cowey has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms

and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

67.  Plaintiff Cowey intends and desires to lawfully carry a loaded, operable handgun on her person, in public, including for purposes of self-defense and in case of confrontation.

68.  Plaintiff Cowey intends and desires to acquire a LTCF from the County Defendants.

69.  As a result of the County Defendants' policies and enforcement practices, including their closure of their ACSO Firearms Division, Plaintiff Cowey is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106 and 6107, which Defendants are actively enforcing and thereby, *inter alia*, preventing her from carrying a loaded, operable handgun on her person, in public, and in case of confirmation, for all lawful purposes including self-defense.

70.  Plaintiff Cowey at one point taught in middle school and high school, has a degree in art, and is currently freelance art designer and stay at home mother.

71.  Plaintiff Cowey has a 16-month-old daughter.

72.  Plaintiff Cowey is concerned about street crime and social unrest on the rise, and has decided she wants to carry a loaded, operable firearm for self-defense in public, especially now that she has a child in her care.

73. Plaintiff Cowey has been trying to acquire a LTCF since March 2020. During the period Plaintiff Cowey has sought to acquire her LTCF, County Defendants' ACSO Firearms Division has been either closed or it has been impossible to get an appointment to even apply for a LTCF there. At one time, Plaintiff Cowey came to understand that County Defendants' ACSO Firearms Division's LTCF application appointments were booked out until 2022. Consequently, she has been frustrated and discouraged from acquiring her LTCF by County Defendants' policies and practices.

74. To date, Plaintiff Cowey has been unable to make or attend an appointment at Defendants' ACSO Firearms Division to submit a LTCF application, thereby preventing her from exercising her constitutionally enumerated right to bear arms.

### *Facts Specific to Plaintiff Schmidt*

75. The foregoing paragraphs are incorporated herein as if set forth in full.

76. Plaintiff Schmidt is not disqualified from exercising Second Amendment Rights.

77. Plaintiff Schmidt:

   a. Is a United States citizen;

   b. Is a resident of Allegheny County, Pennsylvania, and citizen of the Commonwealth;

c.  Is over the age of 21;

d.  Is not under indictment;

e.  Has never been convicted of a felony or misdemeanor crime of domestic violence;

f.  Has never been convicted of a crime punishable by more than one (1) year;

g.  Is not a fugitive from justice;

h.  Is not an unlawful user of, or addicted to, any controlled substance;

i.  Has not been adjudicated a mental defective or been committed to a mental institution;

j.  Has not been discharged from the Armed Forces under dishonorable conditions;

k.  Has never renounced her citizenship; and,

l.  Is not the subject of a restraining order relating to an intimate partner.

78.  Plaintiff Schmidt has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

79.   Plaintiff Schmidt is concerned about street crime and social unrest on the rise, and has decided she wants to carry a loaded, operable firearm for self-defense in public.

80.   Plaintiff Schmidt intends and desires to lawfully carry a loaded, operable handgun on her person, in public, including for purposes of self-defense and in case of confrontation.

81.   Plaintiff Schmidt intends and desires to acquire a LTCF from the County Defendants.

82.   As a result of the County Defendants' policies and enforcement practices, including their closure of their ACSO Firearms Division, Plaintiff Schmidt is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106 and 6107, which Defendants are actively enforcing and thereby, *inter alia*, preventing her from carrying a loaded, operable handgun on her person, in public, and in case of confirmation, for all lawful purposes including self-defense.

83.   To date, Plaintiff Schmidt has been unable to make or attend an appointment at Defendants' ACSO Firearms Division to submit a LTCF application, thereby preventing her from exercising her constitutionally enumerated right to bear arms.

### *Facts Specific to Plaintiff Booth*

84.   The foregoing paragraphs are incorporated herein as if set forth in full.

85.   Plaintiff Booth is not disqualified from exercising Second Amendment Rights.

86.   Plaintiff Booth:

    a.  Is a United States citizen;

    b.  Is a resident of Allegheny County, Pennsylvania, and citizen of the Commonwealth;

    c.  Is over the age of 21;

    d.  Is not under indictment;

    e.  Has never been convicted of a felony or misdemeanor crime of domestic violence;

    f.  Has never been convicted of a crime punishable by more than one (1) year;

    g.  Is not a fugitive from justice;

    h.  Is not an unlawful user of, or addicted to, any controlled substance;

    i.  Has not been adjudicated a mental defective or been committed to a mental institution;

    j.  Has not been discharged from the Armed Forces under dishonorable conditions;

k.  Has never renounced his citizenship; and,

l.  Is not the subject of a restraining order relating to an intimate partner.

87.  Plaintiff Booth has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

88.  Plaintiff Booth is concerned about street crime and social unrest on the rise, and decided he wants to carry a loaded, operable firearm for self-defense in public.

89.  Plaintiff Booth intends and desires to lawfully carry a loaded, operable handgun on his person, in public, including for purposes of self-defense and in case of confrontation.

90.  Plaintiff Booth intends and desires to acquire a LTCF from the County Defendants.

91.  As a result of the County Defendants' policies and enforcement practices, including their closure of their ACSO Firearms Division, Plaintiff Booth is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106 and 6107, which Defendants are actively enforcing and thereby, *inter alia*, preventing him from

carrying a loaded, operable handgun on his person, in public, and in case of confirmation, for all lawful purposes including self-defense.

92. Plaintiff Booth is in his third year of dentistry school. Plaintiff Booth is the president of his class and works as a dental assistant while attending school to be a licensed dentist.

93. Plaintiff Booth has completed an NRA Basic Pistol course of firearm instruction.

94. Plaintiff Booth has on multiple occasions attempted to get an appointment with County Defendants' ACSO Firearms Division to apply for and be issued a LTCF since sometime early in 2020.

95. Plaintiff Booth has further spoken to people in the County Defendants' Sheriff's Office, and even contacted the Pennsylvania Attorney General's office, trying to apply for his LTCF, to no avail.

96. To date, Plaintiff Booth has been unable to make or attend an appointment at Defendants' ACSO Firearms Division to submit a LTCF application, thereby preventing him from exercising his constitutionally enumerated right to bear arms.

### *The Controlling Constitutional Text, and the History and Tradition that Informs It*

97.   The United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II.

98.   The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

99.   The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

100.   "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35.

101.   In *Heller*, the Supreme Court also held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of

confrontation." *Heller*, 554 U.S. at 592.

102.  This is " 'a natural right which the people have reserved to themselves, confirmed by the Bill of Rights,' " *Heller*, 554 U.S. at 594 (quoting A Journal of the Times: Mar. 17, NEW YORK JOURNAL, Supp. 1, Apr. 13, 1769).

103.  And the meaning of the right during the founding-era—which the high court has commanded must still control today—"unambiguously" "refer[red] to the carrying of weapons outside of an organized militia." *Id.* at 584. It is clear that, "[a]t the time of the founding, as now, to 'bear' meant to "carry." *Id.*

104.  *Heller* commands that the fundamental right to *bear* arms for self-defense and in case of confrontation—as part and parcel of "the natural right of resistance and self-preservation," *Heller*, 554 U.S. at 594—is of particular importance when it comes to ensuring citizens' ability to carry *handguns* for such purposes, because the court has explicitly recognized the handgun as "the quintessential self-defense weapon" in this country and that any complete prohibition against their carry and use is necessarily invalid. *Id.* at 629.

105.  *Heller* mandates that the constitutionality of restrictions on the rights enshrined in the Second Amendment must be scrutinized under the text of the Constitution itself, looking to the history and tradition to inform its original public meaning. The high court has directed the analysis be "guided

by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). We look to "the historical background of the Second Amendment" because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id.* at 592.

106.    The U.S. Supreme Court in *Heller* held that to "bear arms" means to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998)) (internal quotations omitted).

107.    Throughout American history, arms carrying was a right as to all peaceable citizens. Sometimes, it was even a duty. *See e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 573–577, 587 (2019) (listing statutes requiring arms carrying by members of the general public to travel, work in the fields, work on roads and bridges, attend church, and attend court).

108.  Historically, under the Constitution's relevant history and tradition, only dangerous persons have been acceptably deprived of the right to bear arms. Peaceable persons have always been free to carry arms for self-defense and other lawful purposes. *See generally* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020).

109.  The tradition of disarming violent and dangerous persons was practiced from medieval England through mid-20th century America, but there is no tradition of disarming nonviolent people like Plaintiffs Cowey, Schmidt, and Booth, and those similarly situated. *Id.*

110.  No laws requiring government permission for American citizens to carry a firearm existed before the twentieth century—including at the time of the ratification of the Second Amendment in 1791. What laws did exist were indisputably unconstitutional, as they were the product of racist views long since abandoned as antithetical to the core purposes of the rights guaranteed all citizens under the Constitution. As the high court declared in *Brown v. Board of Ed.,* 347 U.S. 483, n. 5 (1954), quoting *In re Slaughter-House Cases*, 1873, 16 Wall. 36, 67-72:

> [The Fourteenth Amendment] 'ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring

that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race.'.

111.   When the Supreme Court of North Carolina upheld the "Act to prevent Free Persons of Colour from carrying Fire-arms" in 1844, its opinion was based on the now clearly untenable rationale that "Free people of color in this State are not to be considered as citizens, in the largest sense of the term, or, if they are, they occupy such a position in society, as justifies the legislature in adopting a course of policy in its acts peculiar to them—so that they do not violate those great principles of justice, which lie at the foundation of all laws." *State v. Newsom*, 27 N.C. 250, 250 (1844).

112.   Defendants' laws, policies, and practices are, in pedigree, substance, and effect, the same kind of racist regulations that prevented African-American freedmen from exercising their right to keep and bear arms under Jim Crow and similar suspect-class-based restrictions.

### *The Defendants' Impermissible Infringement of the*
### *Right to Bear Arms*

113.   As detailed above, nothing in the text itself nor the applicable history or tradition of the Second or Fourteenth Amendments supports the infringement and burdens that the enforcement of Defendants' laws and policies impose on the ability of law-abiding citizens, like Plaintiffs and those similarly situated, to otherwise lawfully and peaceably carry loaded handguns for all lawful purposes, including self-defense in case of confrontation, in the exercise of their fundamental right to bear arms.

114.   Taken together, Defendants' enforcement of their policies, laws, and regulations amounts to a total ban on the right of Plaintiffs, Plaintiffs' members and supporters, and those who are similarly situated, to bear loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

115.   Plaintiffs, Plaintiffs' members and supporters, and those similarly situated are forced to choose between compliance with the law in order to avoid prosecution which, if convicted, would result in a lifetime prohibition on the exercise of their Second Amendment right and "unlawfully" carrying a firearm for self-defense as guaranteed by the Second Amendment of the United States Constitution.

## COUNT ONE
## DEPRIVATION OF CIVIL RIGHTS
## RIGHT TO KEEP AND BEAR ARMS
## U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983
### (*Plaintiffs v. Defendants*)

116.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

117.   There is an actual and present controversy between the parties.

118.   42 U.S.C. § 1983 prohibits state actors from depriving a person of federal constitutional rights under color of state law.

119.   The Second Amendment states that "the right of the people to keep and bear arms shall not be infringed."

120.   The Supreme Court has held that the right to keep and bear arms is a fundamental right, the core of which is for self-defense.  *Heller*, 554 U.S. at 581.

121.   In *Heller*, the U.S. Supreme Court defined "bear arms" as to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584.

122.   In *McDonald*, the Supreme Court held that the Second Amendment is incorporated as applicable to the states through the Fourteenth Amendment. 561 U.S. at 791; *Id*. at 806 (Thomas, J., concurring).

123.   The Supreme Court has made clear the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms as among those fundamental rights *necessary* (i.e., essential) to our system of ordered liberty, *McDonald*, 561 U.S. at 778, 791, and as a privilege and immunity of citizenship, *id.* at 805 (Thomas, J., concurring).

124.   "The very enumeration of the [Second Amendment] right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 635 (emphasis in original).

125.   The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780, and it cannot "be singled out for special—and specially unfavorable—treatment," *id.* at 778–79.

126.   The Constitution elevates Plaintiffs' rights above Defendants' convenience or administrative concerns. "[T]he prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 691 (1977).

127. And "it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).

128. Defendants' laws, policies, enforcement practices, and customs challenged herein that individually and collectively violate the constitutional right to bear arms are not longstanding, have no historical pedigree, and are not rooted in our Nation's traditions.

129. There are many other less restrictive rules that could be adopted to minimize the risk to those applying for LTCF licenses.

130. Defendants' laws, policies, and enforcement practices prevent law-abiding individuals not prohibited from possessing or acquiring firearms from carrying loaded, operable firearms on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

131. Defendants' laws, policies, and enforcement practices are more extensive than necessary and are not the least restrictive means of addressing the carriage of firearms by persons who are disqualified from exercising Second Amendment rights under state and/or federal laws.

132. In *Heller*, the Supreme Court declared unconstitutional the District of Columbia's laws that, *inter alia*, prevented Mr. Heller from having a handgun

on his person that was "operable for the purpose of immediate self-defense." 554 U.S. at 635.

133.  By preventing legally eligible adults, like and including Plaintiffs, Plaintiffs' members and supporters, and others similarly situated to them, from bearing arms as they are constitutionally entitled, Defendants have violated the Plaintiffs' rights protected under the Second and Fourteenth Amendments and denied them those arms for the purpose of immediate self-defense and all lawful purposes.

134.  Plaintiffs and other adults like them have been and will continue to be subject to the Defendants' laws, policies, and enforcement practices which deny access to, exercise of, and violates their right to bear arms, including but not limited to the right to immediate self-defense in case of confrontation.

135.  As to all claims made in a representative capacity herein, there are common questions of law and fact that substantially affect the rights, duties, and liabilities of many similarly-situated Pennsylvania and County residents and visitors who knowingly or unknowingly are subject to the Defendants' laws, regulations, policies, and enforcement practices at issue.

136.  Defendants' laws and enforcement policies, practices, and customs preventing legally eligible individuals from bearing loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of

confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles violate the enumerated, fundamental, individual right to bear arms.

137. Defendants have and will continue to enforce their laws, policies, practices, and customs against Plaintiffs, Plaintiff FPC's members and supporters, and similarly situated persons.

138. Plaintiffs reasonably fear that Defendants will enforce against them their laws and Defendants' related enforcement policies, practices, and customs.

139. Plaintiffs thus seek declaratory, preliminary, and permanent injunctive relief, as this action involves matters of substantial public interest.

140. The Second and Fourteenth Amendments to the United States Constitution guarantee adult citizens of States their fundamental right to keep and bear arms, both in the home and in public places, including but not limited to while on public streets, sidewalks, and spaces or in a motor vehicle.

141. The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

142. The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, keep, and carry loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of

confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

143. Plaintiffs Cowey, Schmidt, and Booth are law-abiding citizens who are not disqualified from exercising their rights under the Second Amendment.

144. Plaintiffs Cowey, Schmidt, and Booth desire to obtain a LTCF so that they would be exempt from the restrictions, criminal sanctions, and penalties imposed by Pa.C.S. §§ 6106 and 6107, and thus be able to lawfully carry a loaded, operable handgun on their person, in public and in motor vehicles, for self-defense and all lawful purposes.

145. Plaintiffs Cowey, Schmidt, and Booth meet all the eligibility requirements for the issuance of a LTCF as provided for by 18 Pa.C.S. § 6109(e).

146. Plaintiffs Cowey, Schmidt, and Booth, Plaintiff FPC's members and supporters, and those similarly situated to them, wish to exercise their fundamental, individual right to bear arms and would do so, but for Defendants' laws, policies, and enforcement practices and reasonable fear of enforcement, including but not limited to arrest, prosecution, loss of liberty, and lifetime loss of their enumerated right to keep and bear arms should they be convicted of an offense under 18 Pa.C.S. §§ 6106 and 6107.

147. By and through their policies and enforcement practices of closing the ACSO Firearms Division, , limiting or inadequately providing their ACSO Firearms

Division with staff and other resources, limiting the public's access to their rights through the ACSO Firearms Division, and/or dis-favorably treating the ACSO Firearms Division and its services relative to other units and services, County Defendants and their ACSO are singling out the fundamental, individual right to keep and bear arms for "special—and specially unfavorable—treatment." *McDonald*, 561 U.S. at 779.

148. County Defendants, and their ACSO Firearms Division, have and are currently enforcing laws and policies denying law-abiding adult citizens in Allegheny County their fundamental, individual right to bear arms, by and through, *inter alia*, their closure and imposition of restrictions upon the ACSO Firearms Division, their severe and undue delays in the acceptance and processing of LTCF applications, and their enforcement of 18 Pa.C.S. §§ 6106 and 6107, which prevents those individuals from carrying a loaded, operable handgun on their person, in public on public streets, sidewalks, and spaces and in motor vehicles, in case of confrontation, and for the purpose of immediate self-defense.

149. As a result of County Defendants' ACSO Firearms Division policies and practices, and active and continuing enforcement of the same, Plaintiffs Cowey, Schmidt, and Booth cannot even apply for much less be issued a LTCF now and for at least many months, well into 2021 or longer.

150.   By Defendant Evanchick's enforcement of 18 Pa.C.S. § 6109(b), no otherwise qualified, law-abiding Allegheny County resident, including Plaintiffs Cowey, Schmidt, and Booth may make an application for a LTCF with a sheriff of another county that has not ceased to process LTCF applications, erecting a complete bar to the acquisition of a LTCF.

151.   As a result of Defendants' active enforcement of their laws and policies, Plaintiffs Cowey, Schmidt, and Booth cannot apply for and timely be issued a LTCF under 18 Pa.C.S. § 6109, therefore subjecting Plaintiffs and others like them to the restrictions and criminal sanctions imposed by 18 Pa.C.S. §§ 6106 and 6107, which Defendants have at all relevant times enforced, and are actively enforcing today.

152.   Plaintiffs Cowey, Schmidt, and Booth would acquire a LTCF for lawful purposes, including self-defense, in order to be exempt from the Defendants' criminal laws and associated penalties, but they are effectively barred from doing so due to County Defendants' active enforcement of their laws and policies, including but not limited to their closure of the ACSO Firearms Division, treating the ACSO Firearms Division and the services it provides as non-essential, allowing only limited and/or inadequate public access to the ACSO Firearms Division, providing only limited and/or inadequate resources to the ACSO Firearms Division, and failing to timely accept and LTCF

process applications for and issue LTCFs under 18 Pa.C.S. § 6109 by refusing to institute an efficient and effective application processing system involving e-mail, the U.S. postal service, a courier service, an online LTCF permitting system like Permitium's PermitDirector, or another technologically-based alternative necessary to ensure timely acceptance and processing of such applications.

153. Plaintiffs Cowey, Schmidt, and Booth, Plaintiff FPC's members and supporters, and similarly situated members of the public who do not currently possess a valid LTCF cannot lawfully carry handguns in any manner (i.e., openly or concealed), in the Commonwealth of Pennsylvania because of the Defendants' laws, policies, and active enforcement of them.

154. Plaintiffs Cowey, Schmidt, and Booth wish to, but have abstained from, carrying a loaded, operable handgun on their person, in public and in motor vehicles, in case of confrontation, and for the purpose of immediate self-defense, for fear of arrest, prosecution, incarceration, fine, and loss of liberty and loss of their right to keep and bear arms under Defendant Evanchick's laws and Defendants' enforcement of them.

155. Plaintiffs Cowey, Schmidt, and Booth reasonably fear arrest and prosecution for exercising their rights by carrying a loaded, operable handgun on their

person outside the home, in public, because of the Defendants' laws, policies, and active enforcement of them.

156. Defendant Evanchick is responsible for the formulation, issuance, and/or implementation of the Commonwealth's laws, policies, practices, and customs at issue in this case.

157. Defendant Evanchick has and continues to enforce the Commonwealth's laws, policies, customs, and practices against Plaintiffs and is in fact presently enforcing and threatening to enforce the challenged laws, policies, customs, and practices against Plaintiffs and others like them.

158. County Defendants, and their ACSO Firearms Division, have and continue to enforce the challenged laws, policies, customs, and practices against Plaintiffs and are in fact presently enforcing and threatening to enforce the challenged laws, policies, customs, and practices against Plaintiffs and others like them.

159. Plaintiff FPC has an associational interest in defending and asserting the rights of their members and similarly situated members of the public against Defendants' laws, policies, and enforcement practices.

160. Because of Defendants' laws, policies, and enforcement practices complained of herein, Plaintiff FPC has had to expend time and resources to review and investigate Defendants' laws, policies, and enforcement practices, and respond to public inquiries made to it by members of the public seeking

information and advice on how to exercise their right to bear arms and related legal remedies, thereby causing damages and diversion of resources that FPC could and would have used to engage in other important efforts and programs.

161.  Defendants' laws, policies, and enforcement practices target and impact normal, legally eligible adults, like Plaintiffs, members and supporters of Plaintiff FPC, and all similarly situated individuals constitutionally entitled to bear, carry, and lawfully use arms for all lawful purposes, including self-defense, in public.

162.  Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Cowey, Schmidt, and Booth, all similarly situated members and supporters of Plaintiff FPC, and all other similarly situated individuals, through their enforcement and implementation of the Commonwealth's laws and regulations.

163.  County Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Cowey, Schmidt, and Booth, all similarly situated members and supporters of Plaintiff FPC, and all

other similarly situated individuals, through their enactment and enforcement of their policies, practices, and customs, including but not limited to the Commonwealth's criminal laws banning carry of firearms, the closure of the ACSO Firearms Division, the ACSO Firearms Division's appointment scheduling and other delaying policies, the failure or refusal to provide the ACSO Firearms Division the resources sufficient to perform its duties and provide constitutionally necessary services, the refusal to provide alternative means of accepting and processing LTCF applications and issuing LTCF licenses, the imposition of unnecessary and severe delays and other burdens on applicants, and other such policies and practices, which have denied, and will continue to deny and prevent by criminal sanction, the exercise of the fundamental right to bear arms in public for self-defense and in case of confrontation unless and until redressed through the relief Plaintiffs seek herein.

164. Defendant Evanchick, under color of State law at all relevant times, has deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Cowey, Schmidt, and Booth, all similarly situated members and supporters of Plaintiff FPC, and all other similarly situated individuals, through his enforcement of the Commonwealth's criminal laws banning carry

of firearms, the Commonwealth's law preventing applicants from applying to another open sheriff's department for a LTCF, and his related policies and regulations.

165.   Plaintiffs have incurred nominal damages, attorney fees, and costs as a direct result of Defendants' laws and policies, and their enforcement of them, as well as filing and prosecuting the present action.

166.   42 U.S.C. § 1983 creates a cause of action against state and local government actors who deprive individuals of federal constitutional rights under color of state law.

167.   Defendants' laws, policies, practices, customs, and ongoing enforcement of them violates the rights of Plaintiffs Cowey, Schmidt, and Booth, Plaintiff FPC's members and supporters, and similarly situated members of the public, and are thus causing injury and damage actionable under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, as follows:

a)   A declaratory judgment that Defendants' laws, regulations, policies, enforcement practices, and actions individually and collectively prevent Plaintiffs, Plaintiff FPC's members and supporters, and similarly situated individuals not prohibited from acquiring and possessing firearms and

ammunition, from carrying loaded, operable firearms, including handguns, on their person, in public and in their vehicles, for all lawful purposes including self-defense, and thus violate the right to keep and bear arms protected under Second and Fourteenth Amendments to the United States Constitution;

b)  An order temporarily, preliminary, and permanently restraining and enjoining Defendants and their officers, agents, servants, employees, all persons in concert or participation with them, and all who have notice of the injunction, from enforcing Defendants' laws, regulations, policies, enforcement practices, and actions that individually and collectively prevent Plaintiffs, Plaintiff FPC's members and supporters, and similarly situated individuals not prohibited from acquiring and possessing firearms and ammunition, from carrying loaded, operable firearms, including handguns, on their person, in public and in their vehicles, for all lawful purposes including self-defense;

c)  An order requiring County Defendants, their ACSO Firearms Division, and their respective units, employees, officers, and agents, and all those with such powers delegated to them, to provide one U.S. Mail-based LTCF application submission and issuance alternative and one or more electronic alternative means for the submission and processing of LTCF applications, accept and process those applications for a LTCF, and immediately issue a LTCF to Plaintiffs Cowey, Schmidt, and Booth, and to similarly situated members of

Plaintiff FPC and the public, upon their submission of an application as soon as they are confirmed by Defendant Evanchick's Pennsylvania Instant Check System (PICS) E-PICS online system as not "disqualified from exercising Second Amendment rights";

d) Nominal damages against Defendant Sheriff Mullen;

e) All other and further legal and equitable relief, including injunctive relief, against Defendants as necessary to effectuate the Court's judgment, and/or as the Court otherwise deems just and equitable; and,

f) Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

Respectfully Submitted,

/s/ Adam Kraut

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
*App. for Pro Hac Vice Forthcoming*

Joshua Prince, Esq.
Attorney ID: 306521
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
P: 888-202-9297 ext. 81114
P: 610-400-8439
E: Joshua@Civilrightsdefensefirm.com

Adam Kraut, Esq.
Attorney Id. No. 318482
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org